## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

**CIVIL ACTION NO. 3:20-CV-00556-JHM**

**MARCUS BENJAMIN, *et al.***                                             **PLAINTIFFS**

**V.**

**JUSTICE AND PUBLIC SAFETY CABINET, *et al.***                    **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on a motion by Defendants Kentucky Justice and Public Safety Cabinet Secretary, Kentucky Department of Corrections Commissioner, Scott Jordan, Patricia Gunter, Berton Bare, Brian Owens, and Justin Garland for summary judgment.  [DN 85]. Fully briefed, this matter is ripe for decision.  For the following reasons, Defendants' motion is **GRANTED**.

## I. BACKGROUND

Six *pro se* prisoner Plaintiffs incarcerated at the Luther Luckett Correctional Complex ("LLCC")—Marcus Benjamin; Kyron Jackson; Martaveus Bell, Jr.; Dion Jah Makonnen Luther; Chadwick Gilbert; and Donquantus Faulkner—brought this action pursuant to 42 U.S.C. § 1983 against the Justice and Public Safety Cabinet ("JPSC") Secretary and the Kentucky Department of Corrections ("KDOC") Acting Commissioner Randy White[1] in their official capacities and against LLCC Warden Scott Jordan, Deputy Warden Patricia Gunter, Sgt. Espinoza[2], Sgt. Berton Bare, Lt. Brian Owens, and Officer Justin Garland in their individual capacities.  Currently, three Plaintiffs remain in this action, Jackson, Bell, and Faulkner (hereinafter cumulatively "Plaintiffs"). [DN 68, DN 95, DN 98].

---

[1] Cookie Crews is currently the Commissioner of the Kentucky Department of Corrections.
[2] The United States Marshals Service served Sgt. Espinoza on July 16, 2021 [DN 72]; however, Sgt. Espinoza has not answered the complaint or filed a responsive pleading.

Plaintiffs challenge a January 29, 2020, "secret memorandum" issued by Defendants, which according to Plaintiffs directs that "inmates had to have their 'dreadlocks' cut if entering/exiting secured locations and if admitted into the prisoner segregation unit" and upon transfer from other institutions or medical trips. [DN 1-2 at 3; DN 1 at 4]. Plaintiffs allege that some of them "have already been assaulted and made to forcibly have their hair cut against [their] religious beliefs and ethnicity, while others have been threatened, menaced, and falsely placed under investigations in order to have their hair unjustly cut by the [Defendants] while enforcing an unauthorized rule." [DN 1-2 at 2]. Of the three remaining Plaintiffs, all of them have had their dreadlocks removed upon entry or reentry to LLCC.

The "secret memorandum" issued by Deputy Warden Gunter regarding "Hair Searches" (hereinafter "hair search policy") provides:

> Inmates entering/exiting the institution through [Transfers/Admissions/Discharge ("TAD")] and/or placed in and assigned to Restricted Housing Unit ("RHU") must have free flowing hair, regardless of length. Braids, corn rolls, dreadlocks etc. are not permitted. Inmates shall be given the option to remove braids, corn rolls, dreadlocks etc. with a reasonable time to do so (30 minutes). If they refuse to remove them, then the hair will be cut using a cell entry team, with video. This is a use of force and must be approved using the normal approval process.
>
> Inmates, who are already assigned to RHU, shall not be permitted to place braids, corn rolls, dreadlocks etc. in their hair. If during rounds you discover that they have done so, the same process as above will be followed.

[DN 85-4].

Plaintiffs maintain that there exists no rule promulgated by KDOC that an inmate must have his hair cut when entering or exiting any KDOC facility or the "Receiving/Transfer" location of an institution. [DN 1-2 at 8]. Despite this, inmates upon arrival at LLCC from another KDOC facility are informed pursuant to this "secret memorandum" that they "would have to have their

ethnic dreadlock hairstyle cut" and were forcibly made to have their dreadlocks removed.  [*Id.* at 8–9].

Plaintiff Bell alleges that upon his arrival at LLCC from the Eastern Kentucky Correctional Complex (which did not cut his hair), "he was told to take his hair from the dreadlock hairstyle that they were in."  [*Id.* at 4].  He alleges that he was threatened with physical force if he refused to allow LLCC staff to cut his hair.  [*Id.*].  Similarly, Plaintiff Jackson asserts that he went on an outside medical trip, but he was not warned that upon return to LLCC, his ethnic hairstyle would be cut.  Plaintiff Jackson maintains that once he came back from the medical trip, he forcibly had his dreadlocks removed by staff without his consent.  [*Id.*].

Plaintiff Faulkner alleges that he requested a "special waiver" to be exempted from having to remove his dreadlocks when entering and exiting the Transfers/Admissions/Discharge ("TAD") area based on his practice of the Rastafarian religion, the fact that he had to take constant medical trips for chronic care problem, and the fact that he did not violate any noted Corrections Policies and Procedures ("CPP") policy.  On February 25, 2020, LLCC denied his special waiver request. [*Id.* at 5].  Based on this denial, Plaintiff Faulkner contends that he attempted to avert his hair being cut by continually refusing medical treatment that required trips outside of LLCC.  Plaintiff Faulkner alleges that he was eventually forced to choose his health over religious practices and cut his dreadlocks to receive outside medical treatment.  [*Id.*].

On February 10, 2020, twenty-five inmates filed a Group Grievance (Grievance # 20-100) regarding the hair search policy.  [DN 85-10 at 4–5].  Both the LLCC Warden and the KDOC Commissioner upheld the hair search policy.  The KDOC Commissioner in upholding the policy found that:

> Staff must be able to search an inmate's hair when exiting or leaving the facility.
> The hair has to be free flowing to search for contraband, especially for dangerous

3

contraband.  It has been found in past situations in the Department where offenders have hidden dangerous contraband in their hair.  Inmates are given an opportunity to remove any knots, buns, braids, pony tails, corn rows, weaves, tight curls, pig tails, dreadlocks or other hair obstructions in order to have free flowing hair.  If an inmate refuses, their hair will be cut only as a last resort.  It should be noted that female offenders do not seem to have any issues with making their hair free flowing under the same circumstances when requested by staff in the Department.  They have some of the same hair styles and are able to undue them in a reasonable amount of time.  Therefore, I concur with the facility on this matter."

[DN 85-10 at 30].

Based on this conduct, Plaintiffs assert that Defendants violated their rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution; under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA); and the Kentucky Constitution and statutes.  As relief, Plaintiffs seek compensatory and punitive damages, declaratory relief, and injunctive relief.  On the Court's initial review of the complaint pursuant to 28 U.S.C. § 1915A, the Court permitted Plaintiffs' § 1983 constitutional claims, RLUIPA claims, and state-law claims to continue against all named Defendants.  [DN 21 at 3].  The Court dismissed Plaintiffs' claims under 18 U.S.C. §§ 241, 242, 247, and 249.  [*Id.*].

Defendants filed a motion for summary judgment [DN 85], Plaintiffs filed a response [DN 89], and Defendants filed a reply [DN 92].  The absence of one of Plaintiffs' signatures resulted in an administrative remand of the motion for summary judgment.  [DN 100].  Because Plaintiffs have since corrected the deficiency, the motion for summary judgment is once again ripe. Accordingly, Defendants' motion for summary judgment [DN 85] is reinstated.

## II. LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis

for its motion and identifying the portion of the record that demonstrates the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party

satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a

genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving

party, the non-moving party must do more than merely show that there is some "metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present

specific facts showing that a genuine factual issue exists by "citing to particular parts of materials

in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine

dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of

the [non-moving party's] position will be insufficient; there must be evidence on which the jury

could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

The fact that a plaintiff is *pro se* does not lessen his obligations under Rule 56. "The liberal

treatment of pro se pleadings does not require the lenient treatment of substantive law, and the

liberal standards that apply at the pleading stage do not apply after a case has progressed to the

summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir.

May 5, 2010) (citations omitted). When opposing summary judgment, a party cannot rely on

allegations or denials in unsworn filings, and a party's "status as a pro se litigant does not alter his

duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485

(6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming

grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence

to defeat the government's motion"). However, statements in a verified complaint that are based

on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

### III.  DISCUSSION

Section 1983 creates no substantive rights but merely provides remedies for deprivations of rights established elsewhere. *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). Two elements are required to state a claim under § 1983. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

### A.  JPSC Secretary and KDOC Commissioner:  Monetary Damages

Plaintiffs sue the Secretary of the JPSC and the Commissioner of the KDOC in their official capacity. "Official-capacity suits . . . 'generally represent [ ] another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). JPSC and KDOC are agencies of the Commonwealth of Kentucky. The Secretary and Commissioner are state officials. A claim against state officials or employees sued in their official capacities are no different from a suit against the Commonwealth of Kentucky. *See Graham*, 473 U.S. at 166. State officials sued in their official capacities for monetary damages are not "persons" subject to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, because Plaintiffs seek damages from state officials in their official capacity, Plaintiffs fail to allege cognizable

claims under § 1983.  *See id.*  Further, the Eleventh Amendment acts as a bar to claims for damages against state employees or officers sued in their official capacities.  *Graham*, 473 U.S. at 169.

Therefore, Plaintiffs' official-capacity claims against former Commissioner White, current Commissioner Crews, and the Secretary of the JPSC for monetary relief must be dismissed.

## B.  JPSC Secretary and KDOC Commissioner: Injunctive Relief

Plaintiffs seek injunctive relief against the JPSC Secretary and the KDOC Commissioner requiring the KDOC and its affiliated detention centers to "provid[e] efficient and prompt oversight and proper training in such matters . . . to prevent such discrimination" [DN 1-2 at 15] and prohibiting the "discriminatory practice" by LLCC of cutting inmates' dreadlocks pursuant to the hair search policy.  Essentially, to determine whether summary judgment in favor of the JPSC Secretary and the KDOC Commissioner is proper, the Court must first determine whether LLCC's hair search policy violates Plaintiffs' constitutional rights under the First, Eighth, or Fourteenth Amendments or Plaintiffs' rights under RLUIPA.[3]

### 1.  First Amendment Free Exercise of Religion

Plaintiff Faulkner alleges that LLCC's hair search policy violates his rights under the First Amendment's Free Exercise Clause.

---

[3] Defendants in both its motion and reply argue that Plaintiffs did not exhaust administrative remedies.  Plaintiffs clearly challenged the constitutionality of the LLCC policy through LLCC's grievance procedures.  Defendants concede that a Group Grievance was filed by Plaintiffs and additional inmates on February 10, 2020, regarding the hair search memorandum.  [DN 85-10 at 4–5].  Additionally, other inmates objected to the cutting of their dreadlocks based on religious beliefs as well and were denied exceptions to the search policy.  *See* [DN 85-10 at 10–32; DN 85-11; DN 85-12].  In fact, the grievance committee, the LLCC Warden, and the KDOC Commissioner determined that Inmate Chadwick Gilbert's grievance regarding the religious implications of cutting his dreadlocks was encompassed in LLCC Grievance #20-100 (the Group Grievance) and would not support a subsequent grievance.  [DN 85-12 at 15, 20].  The KDOC Commissioner reviewed the Group Grievance and affirmed LLCC's determination finding that "[s]taff must be able to search an inmate's hair when exiting or leaving the facility.  The hair has to be free flowing to search for contraband, especially for dangerous contraband.  It has been found in past situations in the Department where offenders have hidden dangerous contraband in their hair."  [DN 85-10 at 30].  In their reply, Defendants now argue that Plaintiff Faulkner was required to apply for a religious accommodation pursuant to CPP 23.1.  However, neither the LLCC Warden nor the KDOC Commissioner advised the inmates that brought the Group Grievance that a religious accommodation pursuant to CPP 23.1 was the proper method of "grieving" the cutting of dreadlocks of Rastafarian-practicing inmates.

The First Amendment provides, in relevant part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'  U.S. Const. amend. I.  "Prisoners retain the First Amendment right to the free exercise of their religion." *Hayes v. Tenn.*, 424 F. App'x 546, 549 (6th Cir. 2011) (citing *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985)).  "A prisoner alleging that the actions of prison officials violate his religious beliefs must show that 'the belief or practice asserted is religious in the person's own scheme of things' and is 'sincerely held.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (citation omitted). "If a prison regulation infringes on a sincerely held religious belief, it is valid only if it is 'reasonably related to legitimate penological interests.'"  *Helm v. Allen*, No. 3:18-CV-P90-RGJ, 2020 WL 1172707, at *3 (W.D. Ky. Mar. 11, 2020) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Here, it uncontested that Plaintiff Faulkner's Rastafarian religious belief is sincerely held and that the cutting of his dreadlocks infringes upon his religious observance.  Accordingly, the question is whether the hair search policy is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

The United States Supreme Court in *Turner* identified four factors to aid in determining whether the policy is "reasonably related to legitimate penological interests": "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Cornwell v. Dahlberg*, 963 F.2d 912, 917 (6th Cir. 1992); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005).

"If the restriction or practice [is] reasonably related to legitimate prison concerns, there is no violation of the First Amendment." *Human Rights Def. Ctr. v. Washington*, No. 1:19-CV-12470, 2021 WL 2895192, at *6 (E.D. Mich. July 9, 2021).  Courts are to give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  As the Sixth Circuit has noted, "a trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (citations omitted).  Rather, "[t]he four *Turner* factors are . . . simply 'relevant' to the ultimate inquiry a court must undertake 'when a prison regulation impinges on inmates' constitutional rights': determining whether a prison regulation is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89).

Applying the *Turner* factors to the facts of this case, the Court finds that LLCC's hair search policy is related to a legitimate penological interest.  First, a valid and rational connection exists between LLCC's hair search policy of requiring free-flowing hair, regardless of length, and the legitimate, neutral governmental interests of jail safety and security.  Defendants produced evidence that braids, corn rolls, and dreadlocks pose a significant risk to jail security and safety because contraband that may be used as a weapon has been concealed in non-free-flowing hair. [DN 85-5, Warden Jordan Aff. at 3].  The record reflects that the January 29, 2020, Memorandum was drafted and implemented because of an email from the KDOC Deputy Commissioner regarding an incident that occurred at the Kentucky State Penitentiary in which contraband was smuggled into the institution via an inmate's non-free-flowing hair. [*Id.*; DN 85-6].  Warden Jordan further attested:

> The purpose of restricting hairstyles upon entry or exit of the prison is to prevent dangerous items and/or drugs from being transported within an inmate's hair into the prison, to protect staff from concealed weapons during the transport of inmates out of the facility, and to prevent harm to the public by dangerous concealed items when an inmate is transported out of the facility to public locations such as medical appointments, court appearances, or other public places.
>
> Similarly, inmates are restricted from having non-free-flowing hair within the restrictive housing unit (RHU).  This is due to the nature of the unit—most inmates in this unit have been convicted of disciplinary offenses and are generally more dangerous than inmates that are not in RHU.  Requiring inmates to have hair that can be searched in RHU ensures that dangerous items are not smuggled or concealed within an inmate's hair within RHU.  This prevents inmates from harming staff or other inmates and protects institutional security.

[DN 85-5 at 3].

Additionally, "case law recognizes the need for and validity of rules regulating the hairstyles of prisoners in the interest of security." *Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013).  Courts routinely uphold grooming policies based upon safety and security concerns. *See Lowe v. Doe*, No. 2:14-CV-535, 2015 WL 9303143, at *2 (S.D. Ohio Dec. 22, 2015); *Johnson v. McCann*, Case No. 08 C 4684, 2010 WL 2104640, at *6 (N.D. Ill. May 21, 2010); *Grayson v. Schuler*, 666 F.3d 450, 452 (7th Cir. 2012) (upholding ban on long hair for security reasons); *Njie v. Dorethy*, 766 F. App'x 387, 391 (7th Cir. 2019) (upholding ban on dreadlocks for security reasons).

Second, the hair search policy does not require the cutting of the inmate's hair, but rather allows the inmates to make the hair free flowing upon entry or exit of the prison or the restrictive housing unit.  "Inmates shall be given the option to remove braids, corn rolls, dreadlocks  etc. with a reasonable time to do so (30 minutes)."  [DN 85-4].  The hair search policy permits inmates to maintain non-free-flowing hairstyles, such as dreadlocks, in areas of the prison where there is less of a threat to institutional safety.

Third, accommodating Plaintiff Faulkner's religious belief of not cutting his dreadlocks when he exits and then reenters the prison for medical appointments would adversely affect prison officials by posing an increased risk to prison officials and inmates by increasing the likelihood that dangerous items are concealed in the inmate's hair. *See Holmes v. Engleson*, Case No. 16 C 5234, 2017 WL 3421499, at *7–8 (N.D. Ill. Aug. 9, 2017) (Although guards can run hands between the locks, "courts have explained that the chief concern is that contraband might be concealed within an individual lock."). Finally, Plaintiff Faulkner has failed to suggest an alternative policy that fully accommodates his rights at a *de minimis* cost to valid penological interests. The alternative suggested by Plaintiffs—a return to permitting inmates to maintain non-free-flowing hair upon entry into LLCC or the RHU—would interfere with valid penological interests.

Thus, the Court finds that the *Turner* factors weigh in favor of LLCC's hair search policy, and the JPSC Secretary and the KDOC Commissioner are entitled to summary judgment as to Plaintiff Faulkner's First Amendment claim.

## 2. RLUIPA

As discussed above, Plaintiff Faulkner is a practicing Rastafarian and grows his dreadlocks in observance of the religious tenets prescribed by his religion. He alleges that the removal of his dreadlocks pursuant to the hair search policy violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

RLUIPA prohibits the governmental imposition of a "substantial burden on the religious exercise" of an inmate unless the government establishes that the burden furthers a "compelling governmental interest" through the "least restrictive means[.]" 42 U.S.C. § 2000cc-1(a); *Fox v. Washington*, 949 F.3d 270, 277 (6th Cir. 2020) ("RLUIPA provides greater protections than the First Amendment."). Under RLUIPA, a plaintiff must show "that the government substantially

burdened [his] religious exercise." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019).  An action substantially burdens religion if "that action forced an individual to choose between 'following the precepts of [his] religion and forfeiting benefits' or when the action in question placed 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Barhite v. Caruso*, 377 F. App'x. 508, 511 (6th Cir. 2010) (quoting *Living Water Church of God v. Charter Tp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007)); *see also New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 589 (6th Cir. 2018) (quoting *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (internal markings omitted)).  Prison regulations or policies that substantially burden sincere religious practice will only be upheld it they further compelling government interests and are the least restrictive means of furthering those interests.  42 U.S.C. § 2000cc-1(a); *Koger v. Mohr*, 964 F.3d 532, 539 (6th Cir. 2020).  While RLUIPA gives prisoners stronger religious protections than the First Amendment, *Holt v. Hobbs*, 574 U.S. 352, 357 (2015), "[c]ourts must give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  *Ackerman v. Washington*, 16 F.4th 170, 179–80 (6th Cir. 2021) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)).

As discussed above, it uncontested that Plaintiff Faulkner's Rastafarian religious belief requiring him to maintain dreadlocks is sincerely held and that the cutting of his dreadlocks substantially burdened the exercise of his religion.  Accordingly, the question is whether the hair search policy "serves a compelling governmental interest in the least restrictive way." *Koger*, 964 F.3d at 539.

The first strict scrutiny step requires Defendants to show that the burden "is in furtherance of a compelling governmental interest."  42 U.S.C. § 2000cc–1(a)(1).  RLUIPA "'requires the Government to demonstrate that the compelling-interest test is satisfied through application of the challenged law to the person.'"  *Ackerman*, 16 F.4th at 188 (quoting *Holt*, 574 U.S. at 363).  "Courts do so by weighing the government's actual interest against 'the burden on [the] person' bringing a claim.'"  *Ackerman*, 16 F.4th at 188 (quoting *Haight*, 763 F.3d at 562–63 (quoting 42 U.S.C. § 2000cc-1(a)).

Defendants maintain that the hair search policy was promulgated to preserve institutional security: "to prevent injury to inmates, prison staff, and the public by preventing inmates from concealing contraband that may be used as a weapon within an inmate's non-free-flowing hair." [DN 85-1 at 12].  The record reflects that while inmates are permitted to have non-free-flowing hairstyles in general population, non-free-flowing hairstyles are not permitted upon reentry to the facility, such as from a medical appointment.

As discussed above, Defendants produced evidence that braids, corn rolls, and dreadlocks pose a significant risk to jail security and safety because contraband that may be used as a weapon have been concealed in non-free-flowing hair.  [DN 85-5, Warden Jordan Aff. at 3].  The record reflects that the January 29, 2020, Memorandum was drafted and implemented because of an email from the KDOC Deputy Commissioner regarding an incident that occurred at the Kentucky State Penitentiary in which contraband was smuggled into the institution via an inmate's non-free-flowing hair.  [*Id.*; DN 85-6].  As it relates to inmates that are transported out of the facility, such as Plaintiff Faulkner, Warden Jordan stated:

> The purpose of restricting hairstyles upon entry or exit of the prison is to prevent dangerous items and/or drugs from being transported within an inmate's hair into the prison, to protect staff from concealed weapons during the transport of inmates out of the facility, and to prevent harm to the public by dangerous concealed items

13

when an inmate is transported out of the facility to public locations such as medical
appointments, court appearances, or other public places.

[DN 85-5 at 3].

Other courts in the Sixth Circuit have recognized that "'[t]he state has a compelling interest
in imposing regulations with respect to hair lengths and types due to serious safety
considerations.'" *Lowe*, 2015 WL 9303143, at *3 (citing *Johnson v. Collins*, No. 3:07-CV-211,
2009 WL 1543811 at *5 (N.D. Ohio June 2, 2009)).  "[P]roper inspection of prisoner dreadlocks
would require close proximity between inmates and the prison guards, thus creating both tension
among the parties and danger to correctional staff." *Lowe*, 2015 WL 9303143, at *3.  The ability
of prison officials to "protect prison guards and inmates from hidden contraband are matters of
paramount concern." *Id.*  The Court agrees with Defendants that KDOC and LLCC have a
compelling interest in stopping the flow of contraband into this facility and within the RHU.  *See*,
*e.g.*, *Bey v. Georgia Dep't of Corr.*, No. 5:19-CV-236 (MTT), 2022 WL 4588970, at *4 (M.D. Ga.
Sept. 29, 2022).

Having determined that Defendants have shown that the burden serves a compelling
interest, they must also show that the burden "is the least restrictive means of furthering [the]
compelling governmental interest."  42 U.S.C. § 2000cc-1(a)(2).  "During this step, courts must
take prison officials' decisions about prison security seriously. After all, prison officials, not
courts, are the experts in how to run a prison." *Byrd v. Haas*, 17 F.4th 692, 699–700 (6th Cir.
2021) (citing *Holt*, 574 U.S. at 364); *see also Cutter*, 544 U.S. at 723.  "Yet at the same time, [the
Sixth Circuit demands] a tailored inquiry that turns on the individual inmate's case." *Byrd*,
17 F.4th at 700 (citing *Haight*, 763 F.3d at 562–64).

Alternatives, such as not cutting Plaintiff Faulkner's dreadlocks when he enters or exits the
prison would impose dangerous burdens on prison officials and inmates, interfere with the safety

14

and security of the detention center, and would be unlikely to ensure the removal of all contraband as dreadlocks cannot be physically searched as free-flowing hair. As emphasized by Warden Jordan, not requiring free-flowing hair would pose an increased risk to prison officials and the public when transporting an inmate out of the prison and would increase the danger to prison officials and inmates within the RHU. [DN 85-5 at 3]. Furthermore, Plaintiff is "housed with inmates who without doubt pose serious security threats, and [LLCC] has an extremely compelling interest in minimizing the risk that anyone in such an inmate population is capable of hiding contraband." *Bey*, 2022 WL 4588970, at *5. Additionally, "[t]he impact upon the prison resources as related to search procedures and the time spent on searching for contraband by staff is a serious consequence" of granting an exception to Plaintiff Faulkner and undermines the interest of safety and security. *Lowe*, 2015 WL 9303143, at *3. "The additional time and manpower required to search an inmate's [non-free-flowing] hair is not an efficient use of [LLCC's] limited resources." *Bey*, 2022 WL 4588970, at *5.

In light of the Supreme Court's emphasis that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," and the Court's "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," *Cutter*, 544 U.S. at 722–23, the Court finds LLCC's security is a compelling government interest and the hair search policy the least restrictive means available to advance that interest in the present matter.[4] Accordingly, the JPSC Secretary

---

[4] Plaintiff Faulkner argues that with respect to his RLUIPA claim, his conduct is protected by *Holt v. Hobbs*. [DN 89 at 6 ("Plaintiff simply evokes Holt.")]. The Court agrees that *Holt* is the proper authority when analyzing a RLUIPA claim; however, the facts of this case do not mirror the facts of *Holt*. In *Holt*, the Supreme Court addressed the question of whether the prohibition of prisoners from growing a ½ inch beard violated a Muslim inmate's rights under RLUIPA. And in holding it does, the Supreme Court rejected the Department of Corrections's argument that a prisoner could use a ½ inch beard to conceal contraband and, thus, found no compelling interest in prohibiting the

and the KDOC Commissioner are entitled to summary judgment as to Plaintiff Faulkner's RLUIPA claim.

### 3. Eighth Amendment

Plaintiffs Bell, Faulkner, and Jackson allege that JPSC and KDOC violated their Eighth Amendment rights by permitting and condoning LLCC's hair search policy that instructed correctional officers to forcibly cut or shave off their dreadlocks when entering the facility or entering secured areas of the facility.  [DN 1-2 at 4].  Plaintiffs argue that this policy is cruel and unusual under the Eighth Amendment.

The Eighth Amendment prohibits the Government from imposing "cruel and unusual punishments" upon prisoners.  U.S. Const. amend. VIII.  The Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).  "The Supreme Court has explained that ''[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.''' *Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087, 1093–94 (6th Cir. 2019) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  However, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (per curiam) (internal quotation marks and citations omitted).

The hair search policy permits removal of non-free-flowing hair once an inmate is given 30 minutes to remove the obstruction himself.  Additionally, while the policy recognizes that forceable removal of non-free-flowing hair such as braids, corn rolls, and dreadlocks is a use of

---

inmate from growing a ½ inch beard.  *Holt*, 574 U.S. at 363–364.  In contrast to *Holt*, a compelling security interest exists in the present case.

force, the policy instructs correctional officers to proceed in accordance with the "use of force" policy of LLCC.

In *Evans v. Vinson*, the Sixth Circuit Court of Appeals held that "the force asserted to . . . remove [a prisoner/plaintiff's] hair [upon entering segregation at KSP] was minor, and not the type to invoke Eighth Amendment protection." *Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *see also Price v. White*, No. 5:13-CV-P76-R, 2013 WL 4773969, at *5 (W.D. Ky. Sept. 4, 2013); *Tipton v. Lumpkin*, No. SA-21-CV-00060-FB, 2022 WL 980278, at *4 (W.D. Tex. Mar. 30, 2022); *Hayes v. Wilkens*, No. CV 18-12006 (KM), 2018 WL 4908284, at *3–4 (D.N.J. Oct. 10, 2018). Here, as in *Evans*, the force asserted to remove the remaining Plaintiffs hair upon entering or reentering LLCC is not the type to invoke Eighth Amendment protections. Therefore, having concluded that the Plaintiffs suffered no Eighth Amendment violations in the execution of the policy, summary judgment is appropriate on Plaintiffs' Eighth Amendment claim against the JPSC Secretary and KDOC Commissioner as well.

### 4. Fourteenth Amendment Due Process

Plaintiffs Bell and Jackson assert that Defendants' failure to give proper notice to inmates that they would suffer "punitive damages"—cutting of their dreadlocks—upon a transfer to LLCC from another facility or upon the return from an outside medical appointment violates the Due Process Clause of the Fourteenth Amendment. [DN 1-2 at 10; DN 1 at 3].

"[P]risoners retain rights under the Due Process Clause and cannot be 'deprived of life, liberty, or property without due process of law,' but these rights are 'subject to restrictions imposed by the nature of the regime to which they have been lawfully committed.'" *Bethel v. Jenkins*, 988 F.3d 931, 943 (6th Cir. Feb. 25, 2021) (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). The "two steps for analyzing a procedural due process claims [include]: (1) 'whether there exists a

liberty or property interest which has been interfered with by the State' and (2) 'whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Bethel*, 988 F.3d at 942 (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

Assuming without deciding that Plaintiffs had a property or liberty interest in their dreadlocks or not having them cut[5], the Court finds that the procedures attendant upon the cutting of their dreadlocks were constitutionally sufficient.  Pursuant to the hair search policy, both Plaintiffs Bell and Jackson were notified about the policy upon their entry or reentry into the facility and were given an opportunity to remove the dreadlocks before they were cut.  Further, considering "the significant government interest in preventing contraband from entering the prison," *Bethel*, 988 F.3d at 944, even an inmate's desire to keep his dreadlocks may appropriately yield to the government's interest in the safety of its penal institutions.  *Bruin v. White*, No. 5:16-CV-00105-TBR, 2021 WL 951024, at *8 (W.D. Ky. Mar. 12, 2021).  *See also Oakes v. Green*, No. CIV A 08-CV-12-HRW, 2008 WL 559683, at *5 (E.D. Ky. Feb. 27, 2008).  Given these considerations, the Court grants summary judgment in favor of the JPSC Secretary and the KDOC Commissioner as to Plaintiffs Bell and Jackson's Fourteenth Amendment procedural due process claim regarding the hair search policy notice.

Furthermore, Plaintiffs present no authority that inmates must be given notice of the hair search policy *prior* to their transfer to LLCC or before leaving the facility.  "Convicted prisoners have no reasonable expectation that they will remain in any particular facility, and prison officials have broad authority to transfer prisoners from one facility to another."  *Meadows v. Henderson*

---

[5] Some case law suggests that forced grooming after initial intake to the prison is "not 'atypical and significant hardship' and is thus not a violation of any protected liberty interest." *McClelland v. Sheriff's Deputy*, No. 2:00-CV-807, 2001 WL 34826228, at *6 (E.D. Va. Mar. 19, 2001); *see also Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991); *Gentry v. Virginia Dep't of Corr.*, No. 1:17CV766 (LO/IDD), 2019 WL 2288438, at *7 (E.D. Va. May 28, 2019), *aff'd in part, vacated in part, remanded sub nom. Gentry v. Robinson*, 837 F. App'x 952 (4th Cir. 2020).

*Cnty. Det. Ctr.*, No. 4:20-CV-P31-JHM, 2020 WL 1310500, at *3 (W.D. Ky. Mar. 19, 2020) (quoting *Meachum v. Fano*, 427 U.S. 215 (1976)). Thus, Plaintiffs do not have a protected interest in remaining in a particular institution; "the transfer of prisoners is within the discretion of the KDOC." *Gatewood v. Beckstrom*, No. 0:14-CV-138-HRW, 2014 WL 4782989, at *3 (E.D. Ky. Sept. 24, 2014). "The decisions to transfer a prisoner to another facility, or to deny a prisoner's request to be transferred to another facility, are simply the 'ordinary incidents of prison life,' which do not implicate an inmate's protected liberty interest." *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Accordingly, Bell and Jackson's transfer into and out of the facility do not implicate a protected liberty interest and do not garner Fourteenth Amendment procedural due process protection.

### 5. Fourteenth Amendment Equal Protection

The Court now turns to Plaintiffs Bell, Faulkner, and Jackson's Fourteenth Amendment Equal Protection claim. In their complaint, Bell states that "this policy is aimed at punishing the Afro-American inmates as a 'protected class of citizens' for the color of the skin" and violates the Equal Protection Clause of the Fourteenth Amendment. [DN 1-2 at 4]. Additionally, Plaintiffs argue that "any notion of discrimination is also obvious from the term 'free flowing'" because the texture of African American hair is never free flowing when the hair is over two or more inches in length. [DN 89 at 1, 4, 7, 10].

The Fourteenth Amendment's Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Davis v. Detroit Public Schools*

*Community District*, 835 F. App'x 18, 22 (6th Cir. 2020) (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty. Ohio*, 430 F.3d 783, 788 (6th Cir. 2005)); *see also Bruin v. White*, No. 5:16-CV-00105-TBR, 2021 WL 951024, at *8 (W.D. Ky. Mar. 12, 2021); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010) (quoting *Scarbrough v. Morgan Cnty. Bd. of Ed.*, 470 F.3d 250, 260 (6th Cir. 2006)); *Bonds v. Oldaker*, No: 3:16-CV-00724-JHM, 2019 WL 1028016, at *4 (W.D. Ky. March 9, 2019).

Defendants argue that Plaintiffs have not established an Equal Protection Clause violation because here, there is no differential treatment based on race or religion, as all inmates entering or reentering LLCC must have their hair, regardless of length, in a free-flowing condition so that it can be searched.  Warden Jordan represents that the purpose of the January 29, 2020, Memorandum was to prevent the smuggling of dangerous contraband into or out of LLCC or in the RHU.  [DN 85-5 at 3].  According to Warden Jordan, "African American inmates are not the only inmate population affected by this policy" because the policy applies to all inmates whose hair is not free flowing.  [*Id.* at 4].  Additionally, Warden Jordan's affidavit also avers the following:

> Inmates that are neither entering nor exiting the prison, nor in the restrictive housing unit ("RHU") are not restricted from having non-free-flowing hairstyles.  Inmates that are "on the yard" are not restricted from having a particular hairstyle [with the exception of having signs or symbols shaved into the hair, such hairstyles are restricted to prevent hair from being used to display gang membership].

[DN 85-5 at 3].

Plaintiffs fail to show that they were treated differently than any other inmates sufficient to demonstrate disparate treatment because they have not shown that LLCC's hair search policy

surrounding the entry or reentry of inmates to the facility are not applied to all prisoners.[6]  *See*, *e.g.*, *Bruin v. White*, No. 5:16-CV-00105-TBR, 2021 WL 951024, at *6–8 (W.D. Ky. Mar. 12, 2021); *Burke v. Clarke*, 842 F. App'x 828, 837–38 (4th Cir. 2021) ("Because Burke [a Rastafarian] hasn't shown that he was treated differently from other long-haired prisoners—with whom he is similarly situated for purposes of the grooming policy—his equal protection claim fails."). Accordingly, the Court finds that there is no dispute of material fact and the JPSC Secretary and the KDOC Commissioner are entitled to summary judgment on Plaintiffs' Fourteenth Amendment Equal Protection claims.

### C.  Individual Liability

Plaintiffs sue LLCC Warden Scott Jordan, Deputy Warden Patricia Gunter, Sgt. Espinoza, Sgt. Berton Bare, Lt. Brian Owens, and Officer Justin Garland in their individual capacities for violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution and their rights under RLUIPA.

### 1.  RLUIPA

RLUIPA does not authorize a cause of action against individual defendants.  *See Merrill v. Jordan*, No. 5:23-CV-P44-JHM, 2023 WL 3570010, at *2 (W.D. Ky. May 19, 2023); *Harrison v. Crick*, No. CV 0:19-81-HRW, 2020 WL 61281, at *6 (E.D. Ky. Jan. 6, 2020).  Therefore, Plaintiff Faulkner's RLUIPA claims against Defendants in their individual capacity are dismissed.

---

[6] Plaintiffs attach three affidavits signed under penalty of perjury from white inmates that state that upon entry to the RHU, they did not have their dreadlocks cut.  [DN 89-2 at 2–4].  In contrast, Warden Jordan states that on June 22, 2020, a white inmate, Jeremy Sescourka, had his dreadlocks removed upon entry into the RHU because his hair was not free flowing.  These affidavits addressing the execution of the hair search policy upon an inmate's entry into the RHU do not create a genuine dispute of fact; all three remaining Plaintiffs had their dreadlocks cut upon entry or reentry into LLCC through the TAD, not upon entry to the RHU.

### 2. Jordan and Gunter

Plaintiffs assert First, Eighth, and Fourteenth Amendment claims against Warden Jordan and Deputy Warden Gunter for their authorship and promulgation of the hair search policy that was issued on January 29, 2020.  In light of the Court's decision that the hair search policy does not violate Plaintiffs' constitutional rights, summary judgment is granted with respect to Plaintiffs' claims against Jordan and Gunter related to the writing and approval of the January 29, 2020, Memorandum.

In as much as Plaintiffs seek to hold Jordan and Gunter liable for the actions of other individual defendants beyond the simple implementation of the hair search policy, these claims would likewise be dismissed.  To state a claim for liability under § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  The doctrine of *respondeat superior*, or the right to control employees, does not apply in § 1983 actions to impute liability onto supervisors.  *Monell*, 436 U.S. at 691; *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80–81 (6th Cir. 1995); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  "Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005).  "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 421.

### 3.  Bare, Owens, Garland, and Espinoza

The only individual liability claims asserted against Defendants Bare, Owens, Garland, and Espinoza were asserted by former Plaintiffs Chadwick Gilbert and Dion Luther.  [DN 1-2 at 3–4;

DN 89 at 3]. Because no claims remain against these Defendants, summary judgment will be granted in favor of them as well.

### D. State Law Claims

Having dismissed Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over their state law claims, including their claims under KRS § 13A.130. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim" in situations when "the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) (holding that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."). Accordingly, the Court will dismiss Plaintiffs' state-law claims without prejudice.

### IV. CONCLUSION

For the reasons set forth herein, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that:

(1) Defendants' motion for summary judgment [DN 85] is **REINSTATED**.

(2) Defendants' motion for summary judgment [DN 85] is **GRANTED**. All federal claims against all Defendants are dismissed with prejudice. Plaintiffs' remaining state law claims are dismissed without prejudice.

(3) The Court will enter a Judgment consistent with this Memorandum Opinion and Order.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:   Plaintiff, *pro se*
      Counsel of Record                                September 21, 2023
4414.014

23